Our next case in the morning is United States v. Stewart. Mr. Wackman. Your Honor, and may it please the Court, my name is Nathaniel Wackman. I represent Mr. Stewart in this case. Mr. Stewart raised four issues in his opening brief about why his conviction should be reversed, but I'd like to focus my presentation today on the first issue, the Rodriguez issue, with a few moments at the end for the Miranda issue, if time permits. The district court's admission of almost all the physical evidence in this case violated the Supreme Court's 2015 decision in Rodriguez v. United States, and the dog sniff that led to the discovery of that evidence, much of that evidence, was not independently supported by reasonable suspicion. Mr. Stewart was stopped for a traffic violation running a red light, and under Rodriguez, that means the permissible length of his detention was to allow the officer to complete the task to address that traffic violation. And here, Officer Ball addressed many of those tasks. Counsel, Rodriguez says that a stop may be extended if the extension is supported by reasonable suspicion. Wasn't that criterion met here? We don't believe so, Your Honor. As we explained in our briefs, the government cites the three facts, three basic facts that we laid out in our briefs to support reasonable suspicion. One was Mr. Stewart's alleged ties to a drug dealer named Geraldo Colon. And as we explained in our brief, we find that basically this boils down to a sighting of Mr. Stewart at Mr. Colon's furniture store, which is a public furniture store a mere five minutes, I believe we said in our brief from his house, in October 2014. Another sighting of Mr. Stewart in December 2014. And neither time was Mr. Stewart observed involved in any sort of illegal or drug activity. And then the fact that an informant named Juan Liz Raga took officers to the same apartment complex where Mr. Stewart lived in May 2014. As we explained in our brief, we think these facts are likely too thin to support reasonable suspicion. Well, but Officer Ball asked Stewart if he'd been arrested before, and he confirmed that he had been arrested for a drug offense. Would that response add to the suspicion raised by the gas station encounter, the reasons they were following him in the first place, and the nervousness? When you combine all the factors, plus the ones that you just mentioned, does the suspicion start to sound a little reasonable? I don't believe so, Your Honor. I first point out that the government has never relied on Mr. Stewart's answer about his criminal history in assessing reasonable suspicion. I think that's highly relevant that they haven't ever pointed to that, either in the district court or in their briefs in this court. But we also just, Your Honor, believe that the factors beyond the criminal history, I guess I would also say, Your Honor, that we think in that context that they've probably waived reliance on that fact. But then I would say just, Your Honor, that we think the other factors, the sightings, the alleged gas station drug deal, just do not add up to reasonable suspicion. Now, hold on a second. Didn't the officers have circumstantial evidence through training, experience, and the fact that Stewart was under investigation for a drug trafficking offense, that he felt that he just witnessed a drug trafficking offense? I mean, this guy pulls up to the gas station. Stewart pulls up. Another guy pulls up. He gets out of his car, into Stewart's car for a couple minutes, gets back in the other car and takes off. He doesn't even pump gas. And that standing by itself might not be enough, but the fact that Stewart was already being under suspicion, wouldn't circumstantial evidence, which officers are allowed to use, raise reasonable suspicion? And then if there's reasonable suspicion, do we even need to address the Rodriguez issue? Well, Your Honor, to take your final point first, if there's reasonable suspicion, then the dog sniff was supported. In this case, we don't believe there was reasonable suspicion. It is true that Mr. Stewart was under investigation, but he was under surveillance for. I'm not going to tell you how to use your time, but I suspect you may be better off moving to your other issues. Yes, Your Honor. In that case, I'll move to our Miranda argument, second issue. Mr. Stewart unambiguously invoked his right to remain silent in this case when Officer Ball asked him if he would like to speak to a detective, and he shook his head no. Now, here I'm worried about the standard of appellate review. You're essentially asking us to make up our own mind. Why shouldn't we be reviewing deferentially the findings of the district judge? Well, Your Honor, we believe the proper standard of review is de novo in this case on this point because, Your Honor, the facts are really undisputed on this point, we believe. Often facts are undisputed, but drawing inferences from the facts is difficult, and the normal rule is that it's not only the facts but the inferences from the facts on which district judges get some discretion, or alternatively, appellate review is deferential. That's the question I'm asking you. Your Honor, in that case, we believe that the district court clearly erred by finding that Mr. Stewart did not unambiguously invoke his right to remain silent, and the reasons that we believe that to be the case are that Officer Ball recognized on the tape that we provided to the court twice that Mr. Stewart said he didn't want to speak to detectives. You know, I have to tell you that I listened to that audio recording, and Officer Ball's response to Stewart's head nod really sounded like a question rather than a statement, and the district court seems to have agreed, you know, with the government's choice of punctuation. If Officer Ball's response was a question instead of a confirmatory statement, how does your argument change? Well, I don't believe it would, Your Honor. Even if Officer Ball asked that in what sounded like a question, he still twice acknowledged later on the tape to detectives, to the arriving narcotics detectives, or excuse me, once on the phone, and then again later when they arrived that Mr. Stewart had communicated to him that he didn't want to speak. And so I think Officer... Yeah, you see in response to that question, Stewart said, I'm cold and I'd like to be placed in a car. And, of course, then Officer Ball tells him that a detective is coming to talk to him regardless, and Stewart again says, I'm cold, I want to be placed in a car. Of course, which he was, and then he's taken to the police station and remirandized, and then he, of course, agreed to talk to different officers. Well, I think one of the key points of evidence that you just named, Your Honor, was the fact that Officer Ball told Mr. Stewart that detectives were going to come to him, talk to him regardless. Frankly, I think the most natural understanding of that phrase is that he understood that Mr. Stewart had communicated that he did not want to talk to detectives. Otherwise, it doesn't really, I don't believe, make as much sense to say that detectives were going to come talk to him regardless of what he had just communicated. And as for Mr. Stewart's request to be put in the car, the government's response brief indicates that that was a request for a venue change. We just don't simply, just don't believe that is the case. I mean, it was January in Indianapolis. It was between 38 and 41 degrees out, and Officer Ball testified at the suppression hearing that Mr. Stewart did not have a coat on. So I think it's completely reasonable to say that he had decided he did not want to talk to detectives and instead wanted to be sitting in a car where it was warm. Counsel, do you have any cases that hold that a defendant shaking his head no is an unambiguous invocation of a right to remain silent? I mean, I couldn't find any. And then when, you agree there aren't any cases like that? We didn't locate any. Okay, and it sounds like Stewart later, when he got to the police station, said he shook his head no because he was kind of frustrated with Brady Ball, not because he was invoking his right to remain silent. And he seemed willing to talk to the other policeman there. Doesn't that show he wasn't invoking his Fifth Amendment rights? Two brief points on that, Your Honor, in response to your question. First is we don't believe that Mr. Stewart's later, the fact that Mr. Stewart later talked with police officers at the police station, casts any doubt on his earlier invocation of his right to remain silent. He was read as Miranda rights at the police station, wasn't he? Indeed, Your Honor, indeed. But his post-invocation behavior cannot cast in doubt his original invocation. And Smith v. Illinois, which is a Supreme Court case, is the case we cited for that proposition. Oh, excuse me, Your Honor. The other point I wanted to make briefly was that the government does cite a piece of trial or of testimony where Mr. Stewart is explaining that he doesn't, was shaking his head at Brady Ball because he was frustrated with him. But immediately before that, Mr. Stewart had explained that he did not want to talk to detectives. So I think the fact is that Mr. Stewart shook his head no, and that was an unambiguous invocation of his right to remain silent. And Officer Ball recognized it as such. That's why he said, we're going to talk to you regardless. That's why he told narcotics detectives that Mr. Stewart didn't want to speak. I'll reserve the remainder of my time. All right. Thank you, counsel. Mr. Reitz. May it please the court, Brian Reitz for the United States. An apparent head nod is ambiguous. Just jumping right in, Judge Rovner, I think the fact that we're quibbling about punctuation to begin with shows that this is ambiguous. Either way, the district court on page 3 and page 9 of its order transcribed Detective Ball's statement with a question mark, which I think emphasizes that that is a factual finding of the district court and that it was ambiguous. But, you know, Officer Ball twice tells other officers that Stewart does not want to talk to detectives. So that makes it appear as if the officer understood that the head nod was a no. Yet Officer Ball also told Stewart that the detectives would be there to talk to him regardless. That sounds like they have no intention of honoring his invocation of his right to be silent. So what on the record gets you past these two problems? Sure, taking those in order. First of all, Sergeant Ball, the first statement about Mr. Stewart not wanting to talk, he said that in context. He thought Mr. Stewart didn't want to talk in public and Detective Ball explained why that drug dealers often don't want to talk in public on the street, because they don't want any one of their colleagues to think they're informing on them. So while Sergeant Ball said that, he took that as an understanding that Mr. Stewart would speak, just not in public, and everything that Mr. Stewart said and did after that corroborated that fact. As to the second point, Your Honor, Sergeant Ball was, I think, simply saying that I'm not going to be the one bringing you in, the detectives are going to talk to you, book you in. I don't think that was a way of saying they're going to interrogate you regardless, but they're going to be the ones taking you to the station and bringing you in, which is fine. I think certainly under this Court's and the Supreme Court's jurisprudence that ambiguous responses should be clarified by police. So I think that is all that Sergeant Ball was doing at that point in time. And stepping back a little bit from that, I would stress that certainly we understand that oftentimes admissions or confessions are the most salient evidence, but I think it's really important here to view that, his statement in context of the evidence the government had. Mr. Stewart was caught with 2,000 grams of cocaine, 1,700 grams of heroin, 1,000 grams of methamphetamine, 100 grams of crack, $500,000 in cash, five guns, money ledgers, 15 phones, and his fingerprints 14 times on the drugs. There was no credible defense whatsoever. So his admission, to whatever extent it was or was not admissible, of course, we think it was admissible. It certainly was harmless error because there was no credible defense to Mr. Stewart's intent to deal that cornucopia of drugs, if you will. What if Stewart had said out loud no when asked if he wanted to talk to a detective? Would that change your argument? Yes. That would be an adamant, unambiguous request to remain silent. If that had happened, the officers in this case should have stopped talking to him. Of course, that didn't happen. An apparent head shake, as Judge Gilbert pointed out, there's no case law saying that that is an unambiguous invocation of the right to remain silent. So taking your hypothetical, yes, that would be the exact sort of thing the Supreme Court had said. Police must stop questioning, but that did not occur. Following up on the hypothetical, if he had said no and then went to the police station and the officers read the Miranda rights and then he decided to talk, would that change the first unambiguous claim not to talk? Basically, can you change your mind? Yes, Your Honor, you can change your mind. We think in that situation, if the officers moved him to the police station and re-inquired, gave him the Miranda, that they may have, in that case, respected his initial right to remain silent. That may become a little trickier case, but we think that would be sufficient as an initial respecting of his right to remain silent. But certainly here, when you have an ambiguous apparent head nod, which we heard today, it's undisputed that it was only an apparent head nod. The police officers under both the Supreme Court and this Court's precedent, in fact, this Court has encouraged officers to inquire further and make sure whether a suspect was invoking his right to remain silent. So really, the officers here did exactly what this Court has said they should do in this situation. And from my reading of the Court, I'm not sure if there was any necessary for me to go into the Rodriguez issue. I'd be happy to answer questions on that or anything about this issue. Counsel, I'm worried about the money laundering convictions. The prosecution in this case seems to be another example of the Department of Justice's belief that anything anybody does with drug proceeds must be money laundering. I'm uncertain why, in light of our decision in Esterman. We think this case clears the bar of Esterman. I would point to three things. First, Mr. Stewart created a sham company in 2012. What does that have to do with anything? The holding of Esterman, as I understand it, is it is not money laundering to put money into your own account because that's not hiding. Correct. The account is linked to you. So why is it money laundering just because it was a shell corporation? That's no different from a personal bank account. There's no corporation attached to that, no business, but it's still your account. Certainly, if that was the only factor, this would be an Esterman problem. However, it's beyond that. Mr. Stewart also took shady financial steps. He had other parties deposit checks. He engaged in this ruse with a friend of his where he gave him money. Then had that friend deposit checks from his business into his account. So it looked like a business was paying Mr. Stewart's business. Can we be confident that that was the basis of the jury's conviction? Under the jury instructions, what was necessary to convict him? Was it necessary to show that he was actually trying to hide the provenance of the money? Or was it sufficient that he just deposited the money into the account? It was required that he was attempting to conceal or disguise the proceeds. That's certainly true, Your Honor. And then after that, he used those deposits to buy a car. So he turned illicit proceeds into a facially valid asset of a car. So that helps show that it was designed to conceal. We have not only the steps that he took to make the business, so it's a little more than just a personal account like Esterman. We have the financial chicanery with Femi Emanuel. We have the weird third-party checks coming in. Then we have him benefiting from that. Mr. Stewart gets a loan from purported income from his business that never had any income to buy a motorcycle. Then he also funneled the money into the business and then bought a company car for the business for almost $20,000, which we know those assets were illicit. So we think in that situation, this is enough to qualify for the Esterman standard. So it's more than just putting your own money into your own account and spending it. That may be right. And, of course, as I understand the defendant's position, he's not challenging the jury instructions. He seems to be saying that the evidence is insufficient as a matter of law, even if the instructions were fine. I believe that to be the case, Your Honor. I'll ask Mr. Wackman that to make sure I understand the argument. I believe that to be your case, Your Honor. We'd also point out that under Esterman 2, Mr. Stewart didn't object to this, so this is plain error review. And to whatever extent this is a close call, and if the court does think it's a close call, I suppose that's understandable. We don't think it's a miscarriage of justice to the extent that it would rise to plain error review. And further, we would also point out, for what it's worth, that Mr. Stewart's life sentence was based on his drug offense. I'm sorry, I didn't hear you. Oh, Mr. Stewart's sentence was based on his drug offense. The money laundering counts are concurrent. While we think they're sufficient, they're not the driver of Mr. Stewart's. There's the $100 special assessment. Why Congress created that and effectively abolished the concurrent sentence doctrine? We're just judges. We're not responsible for the forming of these laws. We certainly don't want to belittle $100 either, Your Honor. Has it been paid? I actually don't know. I'm sorry, Your Honor. I do not know. So we don't think that's plain error. Mr. Stewart may need to make some more sales in order to cover those costs. Yes. I mean, he certainly had enough cash on hand to cover that $100, I think. The court has no further questions. Well, I do. Oh, yes, Your Honor. You can't go home. Well, I'm going to be back in a couple hours. I know that. That's what I mean. You're staying in. It appears that Officer Ball took a few seconds to call back up, 45 seconds to explain electronic ticket writing, and about a minute to conduct the dog sniff. Is there any evidence in the record, any reason for us to conclude that this did not lengthen the stop? In other words, could Officer Ball not have finished writing that ticket in less time than was occupied by these additional tasks? I'm going to answer your question, but I have to start with an aside that, under Rodriguez, the reasonable suspicion in this case drives it, so it makes it okay either way. But with that said, answering your question, I suppose it turns into something of an academic question of what Rodriguez says, but we don't think Rodriguez can be read that narrowly, because Rodriguez does not purport to overrule Illinois v. Cabayas. So there must be a way for officers at the scene to run a dog. This would be one of the easiest, least intrusive ways to do so, and I think Mr. Stewart's argument on this front requires the court to find that two officers discussing how to write a traffic ticket is not traffic related, because if it's traffic related, it doesn't violate Rodriguez. And here, the delay, the purported delay that Mr. Stewart has pointed to, is two officers discussing a traffic ticket. Do you think that the officer in the Rodriguez situation, do you think an officer needs to intentionally prolong the stop? We would say that would be a factor. I would say there's two ways I think it's clear that an officer would violate Rodriguez. First would be the Rodriguez where an officer completes the traffic ticket and holds the suspect or the driver longer to run the dog. He's intentionally doing that. Yes, intentionally doing it. The other way I think the Fourth Circuit's decision in Hill supposes a hypothetical where an officer intentionally slows down the time and is not diligent in order to run a dog. I think that would fall under the situation of Rodriguez. Again, that's intentionally doing so. Yes. But just because an officer's slow at writing a ticket, he's not as efficient as other officers. Right, no. Does the time frame make any difference? In that situation, no, we don't think so. The Supreme Court has always been clear that it's an objective standard and individual characteristics of a specific officer do not turn on, that does not drive the Fourth Amendment. So Fourth Amendment rights violations don't turn on individual characteristics of the officer, and defendants or drivers in general aren't entitled to the most proficient or efficient traffic stop or the most efficient police officer. How about one that you have to teach how to, gosh. Well, Your Honor, I think it's entirely reasonable that police forces would train officers on the scene. Just because it's a rookie officer that takes a little bit longer, that doesn't make it a constitutional violation. What if he were really stupid? Can you imagine 20 minutes later? The touchstone of the Fourth Amendment is always reasonableness. So I suppose there could come a point in time where an officer was so incompetent that it became unreasonable. We certainly don't think that's 45 seconds. And we would end by just saying on that, here we know the traffic stop under Wren was constitutional. The ticket was constitutional. Calling for backup was constitutional. And the dog sniff under Illinois versus Cabias was constitutional. So until Cabias is overruled, this is the sort of stop that is almost inherently going to have to be constitutional. With that, if there are no further questions, I will see you again in a few minutes. Thank you. Thank you. You can go shopping. Thank you, Mr. Reeds. Mr. Wackman, anything further? Yes, Your Honor. Thank you. I'll start with the Rodriguez questions that were at the end and just say that I want to be clear about our argument on Rodriguez, which is not that Officer Ball could have been more efficient or that there's something unconstitutional about training officers. The fact is, is that the 45 to 52 seconds that Officer Ball spent explaining how to write the ticket was solely to enable the dog sniff. It prolonged the traffic stop. It added time to the traffic stop. And under Rodriguez, that sort of prolongation means that the resulting dog sniff and the evidence turned up was unconstitutional. So, I mean, are you saying that the other officer really knew how? No, not at all, Your Honor. We don't, you know, this is an objective standard as the government just communicated. We're not implying anything about anybody's motivations. But the fact is, is that Officer Ball stated three times on the tape that the reason he wanted the backup officer to come to the scene was so that he could run his dog. And so the reason the backup officer was there at all was to enable the dog sniff. And so Officer Ball stopped the traffic stop, the normal progression factors of the traffic stop, for 45 to 52 seconds in order to explain how to write the ticket, which was just a function of the dog sniff, really. And so that's our argument under Rodriguez, Your Honor, is that the basic holding of Rodriguez is that anything that prolongs a traffic stop for the purposes of criminal investigation is unconstitutional unless supported by reasonable suspicion. I wanted to just briefly touch on the government's harmless error argument on Miranda, because I didn't get to that on my opening, and just direct the court to the one. Before your time runs out, I'd like you to address the issue that I flagged. Are you contending that the jury instructions on the money laundering count were incorrect? No, Your Honor. We have only raised the Esterman issue, which is basically a sufficiency of the inference issue. Okay. Thank you. Yes, Your Honor. And briefly on Weisinger, Your Honor, the government pointed to what it termed the overwhelming evidence, but the government needs to deal with the cases which it presented. And Weisinger, we think, is directly on point in that regard. Regardless of how much other evidence, the government relied heavily, heavily on this confession. It played it during its case in chief. It stressed it again during its closing. The Supreme Court has recognized that confessions are extremely moving evidence, and so, Your Honor, I see my time is about to expire if I could just wrap up. We believe that because that is the case the government actually presented, Weisinger is the case that points to why this is not harmless error. Thank you, Your Honor. Thank you. Thank you, counsel. And Mr. Wackman, we appreciate your willingness and that of your law firm to accept this case and your assistance to the court as well as your client. Thank you. The case is taken under advisement.